FILED

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

2015 FEB 27  PM 2: 07

CLERK ..........
WESTE...................
BY _____ NO ____

UNITED STATES OF AMERICA

-vs-                                                                CAUSE NO.  A-14-CR-371-SS

FEDERICO SALDANA

_____

# O R D E R

BE IT REMEMBERED on the 12th day of February 2015, the Court held a hearing in the above-styled cause and the parties appeared in person and through counsel.  Before the Court are Defendant Federico Saldana's Motion to Suppress [#24], and the United States (the Government)'s Response [#28].  Having reviewed the documents, the evidence presented at the hearing, the arguments of counsel, and the governing law, the Court now enters the following opinion and order DENYING the motion.

## Background

Three law enforcement officials who participated in Saldana's stop and the subsequent search of the truck and trailer he was driving on the day in question testified at the hearing.  Their testimony, along with the Court's review of the patrol car video submitted as evidence at the hearing, establishes the following facts:

On November 24, 2014, Williamson County Sheriff's Office narcotics detectives Gary Haston and Heather Vargas were traveling northbound on IH-35.  Haston, a veteran narcotics investigator with 17 years of experience and who has participated in hundreds of drug interdiction cases, was teaching Vargas, a relative newcomer to the narcotics division, drug interdiction

techniques.  At some point, their attention was drawn to a 2008 Chevrolet truck pulling a flatbed trailer transporting a scissor lift.  In particular, Haston noticed the license plates for both the truck and the trailer were newly registered.  A records check showed the trailer's license plate had been issued in Laredo four days earlier on November 20, 2014, and the registered owner was "Daniel Martin Huerta."  The truck's license plate had been registered in San Antonio on July 31, 2014, and its registered owner was "Daniel A. Huerta."

Haston testified to a number of other observations he made.[1]  He noticed the scissor lift had received a new paint job and observed the battery charger area had a new over-coating of paint.  *See* Def. Ex. 2.  Haston also observed the truck was outfitted with what he considered over-sized tires and after-market rims, which he found atypical for trucks pulling a heavy piece of machinery.  *See* Def. Ex. 1.  Haston also testified that in his experience large, after-market rims are often used to hide loads of narcotics.  Haston further noted two pieces of steel had been placed under the wheels of the scissor lift, which Haston interpreted to mean the scissor lift would be on the trailer for a long time—consistent, according to Haston, with drug trafficking.  *See* Def. Ex. 2.

According to Haston, the truck was traveling at approximately 75 miles per hour, and it changed lanes multiple times in an unsafe manner.  Haston described the truck as both following vehicles at an unsafe distance in the lane it occupied, and changing lanes into tight spaces where the trailing car in the lane into which the truck had just moved had to brake to avoid running into the back of the trailer.  Haston referenced two near-collisions he witnessed.  Based on these observations, Haston and Vargas contacted a patrol deputy in a marked unit to conduct a traffic stop.

---

[1] The record is not entirely clear whether Haston made the observations described in this paragraph before or after the traffic stop.

At approximately 12:59 p.m., Deputy Jason Cox, responding to the traffic violation information provided by Haston and Vargas, pulled up behind the truck traveling in the far right lane. *See* Gov't Ex. 1, Clip 1 at 12:59.[2] Cox testified that he could not recall whether Haston relayed his drug suspicions at this time, but Cox assumed the stop related to drugs because he was familiar with Haston's work as a narcotics investigator. The trailer at one point momentarily veered onto the shoulder before returning inside the lane. *Id.* at 12:59:21. Cox initiated a traffic stop on the shoulder of the highway, and the driver stepped out of the vehicle, meeting Cox to the right of the truck away from traffic. *Id.* at 13:01:10. The driver identified himself as Federico Saldana. Saldana indicated he was a truck driver by trade but was not used to driving this sort of truck with a trailer attached. When asked who the owner of the truck and trailer were, Saldana was not able to easily recall the owner's name but did indicate—although the audio is not entirely clear—the owner's first name was "Daniel."[3] *Id.* at 13:02:07.

A few minutes after the stop, Haston and Vargas arrived on the scene. Under questioning, Saldana told the officers he lived in Laredo and was driving the scissor lift to Dallas for repairs as a favor to the owner. Saldana stated he was being paid $300 for the job. Saldana did not know the exact address in Dallas where he was to take the trailer but claimed the plan was for him to call the owner upon arrival in Dallas for the precise address. Approximately six minutes after the stop, Cox informed Saldana he was going to give him a warning based on the traffic violations and indicated

---

[2] The Government submitted as Exhibit 1 Deputy Cox's patrol video in the form of a DVD containing three separate but consecutive clips of the events in question. The DVD references time on a 24-hour clock. For citations, the Court uses the 24-hour notation. When describing the timing of events, however, the Court will use the 12-hour clock notation.

[3] The Government contends Saldana initially offered the name "Miguel" as the owner before later admitting the owner's true name is "Daniel." After carefully listening to the audio, the Court concludes, at a minimum, Saldana did not say "Miguel." The Court further concludes that Saldana likely said the name "Daniel."

he would need the registration information for the vehicles to complete the paperwork.  *Id.* at 13:06:10–45.  Saldana stated he had identifying information for the registered owner in the truck, and Saldana gave Cox consent to retrieve this information from inside the truck.  *Id.* at 13:06:42. Over the next few minutes, Haston continued to gather information from Saldana while Cox looked for the registration documents in the car.  Haston inquired about Saldana's criminal history, and Saldana confirmed he had been arrested multiple times, including for the smuggling of illegal aliens and drugs.  The drug smuggling arrest occurred at a checkpoint in Laredo where Saldana was found to have been transporting drugs in his 18-wheeler.  In the meantime, Cox had been unable to find the registration documents and again asked Saldana where they were.  *Id.* at 13:11:58.  Saldana again directed Cox to the cab of the truck and gave Cox consent to retrieve those documents.  *Id.*

As Haston gathered more information, his suspicions of drug trafficking heightened, and he told Saldana that based on what Saldana was telling him, he believed there was dope somewhere on the truck or trailer.  Haston strongly encouraged Saldana to tell the officers if there were any drugs. Haston told Saldana "this is gonna be a turning point in life for you, and it's gonna start right now." *Id.* at 13:13:09.  Haston told Saldana "we're gonna find [the dope], and your cooperation is going to matter a lot." *Id.* at 13:13:30.  Haston then informed Saldana he wanted to know two things: (1) how much dope there was, and (2) where Saldana was taking the drugs.  *Id.* at 13:13:37.  Saldana responded: "There ain't no dope." *Id.* at 13:13:50.  Haston noted Saldana was evincing signs of nervousness and reiterated "it's going to be a lot less stressful for you if you start cooperating from this point." *Id.* at 13:14:09.  Haston cautioned Saldana that "if there's a load of dope, we're gonna find it." *Id.* at 13:14:15.  Again, Haston asked "how much is there?  Cause you know I know." *Id.* at 13:14:20.  Saldana again responded: "There's no dope." *Id.* at 13:14:25.  Haston asked if there

was cocaine or methamphetamine, and Saldana said no. *Id.* at 13:14:30. At this point, Haston asked "Do you have any objection if we search the truck or trailer?" *Id.* at 13:14:38. Saldana said "no." *Id.* at 13:14:40. Haston followed up: "And we're not gonna find anything? Cause I think we're gonna find it." *Id.* at 13:14:45. Haston gave Saldana another opportunity to cooperate, telling him "now is the time. Cause if you tell me it's not here, and we find it? Then we're already off on the wrong foot, do you understand?" *Id.* at 13:15:00. Saldana confirmed he understood, and Haston asked: "Is that the way we're gonna go?" *Id.* at 13:15:07. Saldana said "yes sir." *Id.* at 13:15:09. Haston clarified, "so you don't have any problems if we search the truck?" *Id.* at 13:15:17. Saldana immediately responded: "No problem." *Id.* at 13:15:20.

Haston and Cox proceeded to make arrangements to have a K-9 unit meet them to conduct a search. Over the next few minutes, Haston and Vargas started searching in and around the trailer and truck. Haston reapproached Saldana and informed him they were bringing in a dog for a search. Haston also asked Saldana again about his criminal history and learned Saldana served 9 years in federal prison. Saldana also claimed he completed probation 3 years prior.

After more questions, the officers had Saldana drive the truck and trailer a few hundred yards to a rest area where it would be safer to conduct the search. *Id.* at 13:30:01–32:15. The officers continued searching the truck and trailer themselves as they awaited the K-9 unit, which arrived roughly ten minutes later. Gov't Ex. 1, Clip 2 at 13:41:25. The K-9 handler, Josiah Bennett, testified he understood from the officers that Saldana had given consent to search, and he therefore proceeded to have the dog search the trailer and the bed of the truck. Bennett next had the dog enter the cab of the truck through the front and rear doors on the driver side from approximately 1:45:55 to 1:46:45. *Id.* at 13:45:55–46:45. Bennett took the dog back to the trailer and the bed of the truck

again before taking the dog to the passenger side of the truck. While the view is mostly obstructed, Bennett seemed to have the dog enter the truck through the front and rear doors on the passenger side from approximately 1:49:55 to 1:51:00. *Id.* at 13:49:55–51:00. Bennett then put the dog back in his patrol car.

Although not apparent from the video, according to Bennett's testimony, the dog alerted twice to the presence of narcotics. The first alert was to a set of tools on the floorboard of the front seat on the passenger side. The second alert was to clothes on the floorboard of the back seat on the passenger side. Comparing this testimony to the video, the Court concludes these alerts occurred, at the latest, by 1:51:00.

After Bennett put the dog away, the officers continued searching the truck and trailer themselves looking for drugs. Bennett used the dog again to search the trailer and the bed of the truck before returning the dog to the patrol car. *Id.* at 14:03:45–10:00. For approximately the next half hour, the officers continued examining the truck and trailer. Their attention increasingly focused on the scissor lift. *Id.* at 14:37:00. The officers made arrangements to transport the truck and trailer to a tire shop for further investigation. They informed Saldana of the plan, and he began driving the truck and trailer himself to the tire shop. Gov't Ex. 1, Clip 3 at 14:46:35. The video evidence ends with Saldana still driving over twenty minutes later.

Sometime thereafter, the parties arrived at the tire shop where the officers checked the depth of the batteries to the scissor lift. After dismantling four batteries, the officers retrieved twenty four bundles of a compressed white powder that field-tested positive for cocaine. Saldana was then placed under arrest. At no point after Saldana gave Haston consent to search the truck and trailer did Saldana revoke his consent.

### Analysis

Saldana has moved to suppress the cocaine under his Fourth Amendment rights, arguing there was no reasonable suspicion to stop Saldana in the first place, and contending there was no probable cause for the detention and subsequent search of the truck and trailer. The Fourth Amendment protects individuals from unreasonable searches and seizures; traffic stops are considered seizures within the meaning of the Fourth Amendment. *Delaware v. Prouse*, 440 U.S. 648, 653 (1979); *United States v. Jones*, 234 F.3d 234, 239 (5th Cir. 2000). Because traffic stops are considered more similar to investigative detentions than formal arrests, courts analyze the legality of traffic stops for Fourth Amendment purposes under the standard articulated in *Terry v. Ohio*, 392 U.S. 1 (1968). *Berkemer v. McCarty*, 468 U.S. 420, 439 (1984). This standard is a two-tiered reasonable suspicion inquiry: (1) whether the officer's actions were justified at the stop's inception; and (2) whether the search or seizure was reasonably related in scope to the circumstances that justified the stop in the first place. *Terry*, 392 U.S. at 19–20; *Jones*, 234 F.3d at 240. In addition, "the investigative methods employed should be the least intrusive means reasonably available to verify or dispel the officer's suspicion in a short period of time." *Florida v. Royer*, 460 U.S. 491, 500 (1983). Once an officer's suspicions have been verified or dispelled, the detention must end unless there is additional articulable reasonable suspicion, but "[a]t that point, continuation of the detention is no longer supported by the facts that justified its initiation." *United States v. Shabazz*, 993 F.2d 431, 435 (5th Cir. 1993). Reasonable suspicion exists when the detaining officer "can point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the search and seizure]." *United States v. Santiago*, 310 U.S. 336, 340 (5th Cir. 2002) (internal quotation omitted).

I.   **First Prong of the *Terry* Test: Reasonable suspicion existed for the traffic stop**

Saldana first disputes the basis for the traffic stop, relying on the fact Saldana did not commit any traffic violations in the presence of Cox, the officer who pulled him over.  "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  The Supreme Court has stated that in making a reasonable suspicion inquiry, a court "must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 266, 273 (2002) (internal quotations omitted).  Reasonable suspicion can vest through the collective knowledge of the officers in a search and seizure operation.  *United States v. Powell*, 732 F.3d 361, 369 (5th Cir. 2013), *cert. denied*, 134 S. Ct. 1326 (2014).  The collective knowledge theory for reasonable suspicion applies so long as there is "some degree of communication" between the acting officer and the officer who has knowledge of the necessary facts.  *United States v. Ibarra*, 493 F.3d 526, 530 (5th Cir. 2007).

Here, Haston testified he observed Saldana having trouble maintaining his vehicle and the attached trailer carrying a piece of heavy machinery in a single lane, and that Saldana was changing lanes in an unsafe manner resulting in two near-collisions.[4]  Haston directly relayed this information to Cox, and Cox proceeded to locate Saldana and conduct a traffic stop.  Therefore, Cox had an objectively reasonable suspicion Saldana had committed multiple traffic violations as witnessed by Haston and Vargas.  In addition, Cox, upon locating Saldana's truck and trailer, witnessed the trailer

---

[4]Section 545.060(a) of the Texas Transportation Code provides that "an operator on a roadway divided into two or more clearly marked lanes for traffic: (1) shall drive as nearly as practical entirely within a single lane; and (2) may not move from the lane unless that movement can be made safely."  TEX. TRANSP. CODE § 545.060(a).

veering onto the shoulder before he initiated the stop.

## II.    Second Prong of the *Terry* Test: The seizure was reasonably related in scope to the circumstances that justified the stop

Saldana also contends the officers' prolonged detention of him exceeded the scope of the reason for the traffic stop.  Generally, the "detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop . . . ." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004).  In the course of effectuating the stop, a police officer may permissibly examine the driver's license and registration and run a computer check on them to investigate whether the driver has any outstanding warrants and if the vehicle is stolen.  *Id.* at 507–08.  An officer may also ask the driver about the purpose and itinerary of his trip.  *Id.* at 508.  Indeed, the officer's questions need not even be related to the purpose of the traffic stop, since "[d]etention, not questioning, is the evil at which *Terry*'s second prong is aimed."  *Shabazz*, 993 F.3d at 436.

Although an officer's inquiry may be wide-ranging, once all relevant computer checks have come back clean, there is no more reasonable suspicion, and, as a general matter, continued questioning thereafter unconstitutionally prolongs the detention.  *Brigham*, 382 F.3d at 510; *see also Santiago*, 310 F.3d at 341–42; *United States v. Jones*, 234 F.3d 234, 241 (5th Cir. 2000).  A recognized exception to this rule is that if additional reasonable suspicion arises in the course of the stop and before the initial purpose of the stop has been fulfilled, then the detention may continue until the new reasonable suspicion has been dispelled or confirmed.  *See Brigham*, 382 F.3d at 507; *United States v. Grant*, 349 F.3d 192, 196 (5th Cir. 2003).

In this case, Saldana came to a stop on the shoulder at approximately 1:01:10.  Haston spent the first five minutes after the stop asking Saldana reasonable questions about ownership of the truck

and trailer and the nature of Saldana's trip.  While Cox attempted to locate the registration papers indicating ownership of the truck and trailer, Haston initiated his own line of questioning.  At 1:14:40, Saldana said he had no objection to the officers searching his truck and trailer and confirmed at 1:15:20 he had no problems with the search.  Put differently, less than fifteen minutes into the stop—when Cox had yet to locate the registration papers which would allow him to complete any traffic violation or warning paperwork—Saldana had already given the officers his unequivocal consent to search the truck and trailer.  At 1:17:20, Cox clarified to Saldana he could not find the paperwork in the truck as Saldana had indicated.  Gov't Ex. 1, Clip 1 at 13:17:20.

Considering these circumstances, the detention did not exceed its original scope.  In a valid traffic stop, an officer can request a driver's license, insurance papers, vehicle registration, run computer checks thereon, and issue a citation or warning.  *See United States v. Kelley*, 981 F.2d 1464, 1469 (5th Cir. 1993).  Haston's questioning occurred while Cox was still in the process of gathering the relevant information to complete the warning paperwork and therefore did not extend the initial valid seizure beyond a reasonable duration.  In other words, as of the time Saldana gave his consent, the detention continued to be supported by the facts that justified the traffic stop.

Moreover, in the alternative, Haston's suspicions regarding potential drug trafficking were ever-increasing as the first fifteen minutes of the stop unfolded.  Indeed, Haston's suspicions began before he saw Saldana committing multiple traffic violations.  Haston noticed the recently registered license plates and ran checks on them, discovering the trailer's license plate had been registered in Laredo four days earlier to Daniel Martin Huerta while the truck's license plate had been registered four months earlier in San Antonio to Daniel A. Huerta.  Haston observed the erratic driving consistent with an individual perhaps unfamiliar with driving this sort of truck and trailer

-10-

combination. Haston noted the oversized tires and after-market rims, which he considered unusual for this type of machinery hauling. Haston observed a new paint job for the scissor lift and the battery charger area as well as corrugated metal plates under the tires of the scissor left. All of these factors continued to build Haston's suspicions there might be a load of narcotics hidden in the truck or the trailer. Haston's suspicions only continued to grow as he questioned Saldana about his trip. Troubling statements from Saldana included: (1) he was not the owner of the truck or trailer; (2) he had trouble recalling the owner's name; (3) he was driving a heavy piece of machinery over 400 miles from Laredo to Dallas for repairs; (4) he did not know the exact address of his ultimate destination in Dallas; (5) he was supposed to call the owner upon arrival in Dallas to find out the actual address; (6) he was hauling the scissor lift as a favor to the owner and apparently for $300; (7) he was not used to driving a truck and trailer combination; and (8) he did not know the name of the owner's painting company.

As a narcotics investigator with 17 years of experience, including hundreds of interdiction cases, Haston strongly suspected Saldana was transporting a load of dope and started inquiring into Saldana's criminal history. Haston learned Saldana had previously smuggled aliens and drugs using his 18-wheeler. Haston told Saldana that he suspected Saldana was again transporting drugs. Haston urged Saldana to cooperate and directly asked if he were moving drugs, which Saldana denied. Haston responded by asking if Saldana objected to or had any problem with the officers searching his truck and trailer, and Saldana stated he had no objection and no problem. Taken together, from the time Cox stopped Saldana for the traffic violations to the point where Saldana gave his consent to search, additional reasonable suspicion arose for Haston both through his observations and

conversations. Haston had yet to either dispel or confirm these accumulating suspicions as of that time, and he could validly prolong the detention in order to address these concerns.

## III.   The Consent was Voluntary and Never Revoked

The Government argues Saldana gave his consent to Haston to search the truck and trailer, and he never revoked that consent at any time. Therefore, according to the Government, none of the events after the moment of consent implicate the Fourth Amendment. "To be valid, consent to search must be free and voluntary." *United States v. Olivier–Becerril*, 861 F.2d 424, 425 (5th Cir. 1988). The government has the burden of proving, by a preponderance of the evidence, that the consent was voluntary. *United States v. Yeagin*, 927 F.2d 798, 800 (5th Cir.1991). The voluntariness of consent is "a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). The appropriate inquiry in determining the voluntariness of a consent is whether a reasonable person in the subject's position would have felt free to decline the officer's request. *Florida v. Bostick*, 501 U.S. 429, 435–36 (1991). In evaluating the voluntariness of consent, courts consider six factors:

> (1) the voluntariness of the defendant's custodial status; (2) the presence of coercive police procedures; (3) the extent and level of the defendant's cooperation with the police; (4) the defendant's awareness of his right to refuse to consent; (5) the defendant's education and intelligence; and (6) the defendant's belief that no incriminating evidence will be found.

*Olivier–Becerril*, 861 F.2d at 426 (citations omitted). All six factors are relevant, but no single one is dispositive or controlling. *Id.*

In the current situation, the first factor weighs against the Government as the officers had temporarily detained Saldana for the purpose of a traffic violation in addition to dispelling or confirming their increasing suspicions of drug trafficking as the situation evolved.

-12-

As for the second factor, there is minimal indication of coercive police procedures.  The stop began as a routine traffic encounter.  Cox and Saldana engaged in a cooperative, polite conversation regarding Saldana's traffic violations, the ownership of the truck and trailer, and the itinerary of Saldana's trip.  Haston also asked Saldana many questions, and Saldana was ready and willing to answer all of them.  Haston's manner certainly became more aggressive as his suspicions grew, but his conduct did not amount to coercion.  Haston openly informed Saldana of his belief as to the presence of narcotics, and Haston applied some pressure in attempting to elicit Saldana's cooperation.  For instance, Haston made the following statements: "this is gonna be a turning point in life for you, and it's gonna start right now"; "we're gonna find [the dope], and your cooperation is going to matter a lot"; "it's going to be a lot less stressful for you if you start cooperating from this point"; "if there's a load of dope, we're gonna find it"; and "how much is there?  Cause you know I know."  While Saldana showed signs of nervousness, he continued to answer the questions and persisted in denying the presence of any drugs.

Ultimately, Haston asked: "Do you have any objection if we search the truck or trailer?"  Saldana responded he did not.  Forty seconds later, Haston again confirmed: "So you don't have any problems if we search the truck?"  Saldana said he had no problem.  While Haston did not specifically tell Saldana he had a right to refuse his search request, both of Haston's questions indicated Saldana could either object to, or express a problem with, a search.  *See Bostick*, 401 U.S. at 432 (finding it is "particularly worth noting" that the police specifically advised the subject he had a right to refuse consent to search his luggage).  Saldana, with no hesitation or seeming concern, gave the officers his consent to look for drugs in the truck and the trailer.  There is no indication in the record that Saldana ever expressed concern or confusion over his consent.  Instead, Saldana

-13-

remained cooperative throughout the process, including driving the truck and trailer to the rest stop

for the dog search and further driving the truck and trailer to the tire shop for more thorough

searching. It cannot be said Saldana merely submitted to overpowering authority. *See Bumper v.*

*North Carolina*, 391 U.S. 543, 549 n.14 (1968) (noting orderly submission to law enforcement who

falsely represented to defendant they had authority to conduct search pursuant to a warrant was not

valid consent); *Kaupp v. Texas*, 538 U.S. 626, 631 (2003) (concluding that in circumstances

involving a 17-year-old boy awakened in his bedroom at 3:00 a.m. by police officers who told him

"we need to go and talk," his response of "okay" was not regarded as consent but a "mere submission

to authority"). In sum, Saldana's consent was not the product of coercion.

Moving on to the third factor, Saldana was quite cooperative as he answered the officers'

questions and caused them no problems. For the fourth factor, there is no indication in the record

Saldana was aware of his right to refuse consent. Yet while officers are not required to explicitly

inform defendants of the right to refuse consent, the wording of both of Haston's questions regarding

consent gave Saldana a clear opportunity to either object to or state a problem with a search.

Moreover, Saldana is a previously convicted felon experienced with the criminal justice system,

including having served at least 9 years in federal prison, which makes it more likely he is aware of

his legal rights. Regarding the fifth factor, there is no evidence in the record demonstrating

Saldana's level of education. His conversations and interactions with the officers do suggest he is

an individual of reasonable intelligence. Finally, with respect to the sixth factor, Saldana did not

testify, so it is difficult to know what his belief was concerning whether any drugs would be found.

He did repeatedly deny there were any drugs. He also was very quick to give his consent to search,

suggesting he believed the officers would not find any drugs.

Taking all six of the factors into consideration, the Court concludes the consent was voluntary and valid, and Saldana never revoked his consent even as the officers increased the intrusiveness of the search. Therefore, the Fourth Amendment does not apply to the events occurring after Saldana's voluntary consent.

## Conclusion

Cox had reasonable suspicion Saldana had committed a traffic violation when he initiated the stop. Within fifteen minutes—and before Cox had completed the initial purpose of the stop by issuing the warning citation—Saldana had voluntarily consented to a search of the truck and trailer. Moreover, Cox and Haston developed additional reasonable suspicion of potential drug trafficking through their observations and conversations with Saldana, and they had yet to dispel or confirm these suspicions as of the time Saldana gave his valid consent. As such, the officers were justified in prolonging the stop during those initial fifteen minutes and through the moment of consent. Saldana never revoked his consent, and the officers ultimately discovered the secreted cocaine. Saldana's Fourth Amendment rights were not violated, and therefore his motion to suppress the drugs and his statements to law enforcement after the discovery of the drugs must be denied.

Accordingly,

IT IS ORDERED that Defendant Federico Saldana's Motion to Suppress [#24] is DENIED.

SIGNED this the _27th_ day of February 2015.

_Sam Sparks_

SAM SPARKS
UNITED STATES DISTRICT JUDGE